Edward L. BROWN, et al.

v.

CAMERON–BROWN COMPANY, et al.

Civ. A. No. 78–0836–A.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 16, 1981.

Calvin W. Breit, Norfolk, Va., Arnold Levin, Gordon Gelfond, Michael D. Fishbein, Philadelphia, Pa., for plaintiffs.

Alan J. Hofheimer, Norfolk, Va., Gerald D. Damsky, Arlington, Va., Howard J. Ross, Washington, D. C., Kellam, Pickrell & Lawler, Robert H. Powell, III, Norfolk, Va., Anne Marie Whittemore, Richmond, Va., Robert Haas, Alexandria, Va., Byron P. Kloeppel, Portsmouth, Va., T. H. Willcox, Jr., Edward Delk, Norfolk, Va., Pickett, Spain & Lyle, Virginia Beach, Va., T. S. Ellis, III, Richmond, Va., John J. Cooleen, Falls Church, Va., Michael A. Inman, C. P., Inman, Lee, Olivieri, & Huffman, P. C., Virginia Beach, Va., Conrad M. Shumadine, Crenshaw, Ware & Johnson, John B. King, Jr., William B. Eley, Norfolk, Va., Nathan H. Smith, Michael W. Smith, Richmond, Va., L. Cleaves Manning, Portsmouth, Va., Breeden, Howard & MacMillan, Norfolk, Va., for defendants.

## STATEMENT OF FACTS

WARRINER, District Judge.

Named plaintiffs in the present suit have moved the Court to certify the suit as a class action under Fed.R.Civ.P. 23(b)(3). Plaintiffs are fourteen mortgagors[1] who assert that, as a condition to obtaining residential mortgage loans, each was required by their prospective mortgagee to make monthly installments to an "escrow account" of $\frac{1}{12}$ the estimated annual amount for local tax levys, insurance premiums and other obligations associated with their property. They seek to represent a class of all borrowers similarly situated. Plaintiffs claim that until the levies come due and the mortgagee makes the payments the escrowed funds are either co-mingled with the mortgagees' general funds or put to other profitable uses without an accounting being made to the mortgagors for interest earned, or otherwise providing mortgagors with a pecuniary benefit for use of their money.

The crux of plaintiffs' complaint is that the periodic installments are placed into "escrow accounts" which are put to profitable use by the mortgagees for their own benefit without either paying interest on the escrow accounts or "capitalizing" the payments to reduce the outstanding principle of the loan itself. They assert the above practices are concerted and violate the antitrust laws as a part of an ongoing conspiracy originating in the 1960's to eliminate the "capitalization" method of accounting for mortgage escrow payments, that the effect of this conspiracy has been a less competitive market in which mortgage loans with escrow payments subject to "capitalization" are unobtainable and, that plaintiffs have been and continue to be injured thereby.

The thirty eight original defendants[2] in the present suit comprise a variety of dif-

---

1. On 27 February 1979, Mrs. Frances Vanderleeuw was dismissed as party plaintiff with prejudice as to her claim, but without prejudice as to other parties plaintiff.

2. To date, the claims against three defendants have been dismissed. They included the claims against: Residential Commercial Mortgage Corp. (21 February 1979); Virginia Federal

ferent types of lending institutions operating under numerous statutes and regulations, both federal and State. Defendants assert that the business practices and loan policies of the several institutions vary between the institutions and even between loans within each institution, depending on a variety of factors including: conditions on the secondary market, internal policy, federal and State statutes and regulations.[3]

The present suit is one of several similar suits that have been filed in various State and federal courts throughout the nation. Plaintiffs in the present suit apparently learned of these suits, and the possibility of their own action, through the activities of counsel at a meeting or meetings of their labor union. Subsequently, they each signed authorizations for the present suit to proceed and acknowledged liability in the amount of up to $5,000 for potential costs. Apart from these actions, named plaintiffs have played a minimal role in the furtherance of the suit and have demonstrated only a minimal knowledge of its nature.

The remaining claims before the Court arise under Section Four of the Clayton Antitrust Act, 15 U.S.C. § 15, Section One of the Sherman Antitrust Act, 15 U.S.C. § 1 and under the Virginia Anti-trust Act, Va. Code § 59.1–9.1, et seq. (Repl.Vol.1973). Jurisdiction over the federal claims is vested in the Court pursuant to 28 U.S.C. § 1337; the State claims fall within the court's pendant jurisdiction. *United States Mineworkers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Venue is properly set in this judicial district, 28 U.S.C. § 1391(b).

In its order of 4 September 1979, the Court addressed and denied plaintiffs' motion for certification of the plaintiff class

pursuant to Fed.R.Civ.P. 23(b)(2) and continued under advisement plaintiffs' motion for certification of the plaintiff class pursuant to Fed.R.Civ.P. 23(b)(3).

## I.

A party moving the Court to certify a suit as a class action must satisfy the several conditions set out in Fed.R.Civ.P. 23, which states in pertinent part:

(a)—Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claim or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b)—Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or unde-

---

Mortgage Corp. (9 April 1979); Fidelity American Mortgage Co. (12 April 1979).

**3.** None of the thirty six defendants answering class interrogatories pays interest on the periodic payments they require but one denies receiving prepayments at all. Twenty-eight of these defendants require prepayments as a condition to the loan, while five others strongly recommend it. Twenty-four defendants have maintained escrow accounts since prior to

1960, some having always used the escrow account method, others adopting the practice in the 1930's and 1950's. Three defendants deny maintaining escrow accounts for alleged purposes. Nine defendants stated they had converted to the escrow account method between 1960 and 1975. In some cases, defendants are required to maintain an escrow account system.

sirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

▮ The moving party is charged with the burden of satisfying both the "prerequisites" to a class action of subdivision (a) and, the "predominance" and "superiority" criteria of subdivision (b). Whether the burden has been met is left to the trial court's discretion and will be reversed only for abuse. *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 (4th Cir. 1977) (en banc) cert. denied, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699 (4th Cir. 1976). The Court, in its determination of whether to certify the class, is bound to take the substantive allegations of the complaint as true. But while the court may not put the plaintiff to preliminary proof of his claims, it may require such supplements to the pleadings to allow an informed judgment on each of the Rule's requirements. *Doctor v. Seaboard Coast Line R. Co.*, supra, at 708; *Blackie v. Barrack*, 524 F.2d 891, 900–01 (9th Cir. 1975) cert. denied 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). It may also look beyond the pleadings, may permit discovery relating to issues involved in maintainability and, may schedule a preliminary evidentiary hearing to assist in determining "whether [the moving party] is asserting a claim which, *assuming its merit*, will satisfy the requirements of Rule 23." *Doctor v. Seaboard Coast Line R. Co.*, supra, at 707 (emphasis in original); *Windham v. American Brands, Inc.*, supra. The Court is proscribed, however, from conducting any preliminary inquiry into the merits of the suit. *Eisen v. Carlisle*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Doctor v. Seaboard Coastline Ry. Co.*, supra; *Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100 (E.D.Va.

1980).[4] That plaintiff may be unable to prove his allegations at trial is not a proper basis for the denial of class certification. *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 178, 94 S.Ct. at 2152.

▮ Similarly, as this Court has previously recognized, the certification stage is an inappropriate time to make any determination as to plaintiffs' standing to represent the putative class. *Turner v. A.B. Carter, Inc.*, 85 F.R.D. 360 (E.D.Va.), rev'd on other grounds sub nom. *Coles v. Havens Realty Corp.*, 633 F.2d 384 (4th Cir. 1980). See generally, 4 H. Newberg on Class Actions § 7518(d) (1977) (hereafter H. Newberg).

## II.

A party moving for class certification under Rule 23(b)(3) must first satisfy the prerequisites to class certification set out in subdivision (a) of Rule 23.

### 1. Numerosity: Rule 23(a)(1):

▮ Rule 23(a)(1) allows for a class action only where the class is so numerous that joinder of all members would be impracticable. As plaintiffs assert the class to number "at least several thousand" and the defendants refer to a potential class of 200,-000, this requirement has been satisfied. 4 H. Newberg, supra, at § 7512.

### 2. Common Questions of Law or Fact: Rule 23(a)(2):

▮ The second prerequisite of Rule 23(a) is that there be *either* a question of law or fact common to members of the class. This requirement, less stringent than the "predominance" requirement of Rule 23(b)(3), necessitates a showing only that there is a common question of law or fact which need not be dispositive of the case. Moreover, the existence of individual issues

---

**4.** Although in *Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968) the court suggested that a court might properly require an offer of proof as to the substantial likelihood of success on the merits, as a precondition to proceeding with notice and other aspects of the class certification process, the procedure was disapproved by the Second Circuit Court of Appeals and most other courts addressing the issue. See *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1016 (2d Cir. 1972), approved in this respect and vacated on other grounds *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732. See generally 3B Moore's Federal Practice ¶ 23.45[3] (2d Ed. 1980).

does not preclude the application of Rule 23 at this stage. 4 H. Newberg, supra at § 7514. Generally, antitrust plaintiffs are found to have satisfied this element in their complaint as an allegation of conspiracy or monopolization will generally be treated as a "central" or "single overriding" issue or, "common nucleus of operative fact" sufficient to establish a common question. Id. (and cases cited therein).

■ The claims in the present suit all relate to an alleged conspiracy on the part of defendants to monopolize and restrict competition on the mortgage market. Plaintiffs' allegations appear sufficient to satisfy this element. See e. g., *Sommers v. Abraham Lincoln Federal Savings & Loan Assoc.*, 66 F.R.D. 581 (E.D.Pa.1975) (finding condition satisfied in a similar escrow case). Individual questions as to liability and damages which may subsequently preclude the use of the class action device do not defeat the applicability of Rule 23 at this stage.

### 3. Typicality: Rule 23(a)(3):

■ In *Turner v. A.B. Carter, Inc.*, supra, this Court set out the several factors it considers in addressing the issue of typicality:

> In considering whether the typicality requirement has been met, the emphasis of the Court's examination is on a square alignment with the class representative's interests with the interests of the class. Although a plaintiff's claim will be considered typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory," Rule 23(a)(3) typicality may "screen out class actions [or class representation] when the legal or factual position of the representatives is markedly different from that of other members, even though common issues of law or fact are raised."

Id. at 364 (citations omitted). However, typicality refers to the nature of the claims of the class representative and not necessarily to the specific facts from which the case arose. See *Minnesota v. United States Steel Corporation*, 44 F.R.D. 559 (D.Minn. 1968); 4 H. Newberg, supra, at § 7518. Where the class representatives' claims are such that they will have to prove the same elements as the remainder of the class, then typicality should be found notwithstanding factual differences between various members of the class. Id.[5]

The defendants assert that plaintiffs' claims are not typical of the class as to those defendants with whom they had no dealings. The defendants rely extensively on the case of *La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973). In *La Mar*, a consolidated case, the court sought to resolve whether a single plaintiff with a cause of action against a single defendant could institute a class action against that defendant and an unrelated group of defendants who had engaged in similar conduct to that of the single defendant, on behalf of all those injured by all the defendants. In holding the plaintiff could not bring such an action, the court stated:

> Under proper circumstances, the plaintiff may represent all those suffering an injury similar to his own inflicted by the defendant responsible for the plaintiff's injury, but in our view he cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury. Id. at 462.

In its consideration of typicality, the court emphasized that just as that requirement was not met when the representative plaintiff lacked a claim of any type against any defendant, the action would also fail where a plaintiff's cause of action, though similar to that of other class members, is against a defendant with respect to whom the class members had no cause of action.

---

**5.** The necessary alignment suggested by the court in *Sommers v. Abraham Lincoln Federal Savings & Loan Assoc.*, supra, was that: "While defendants' claims need not be identical with the class member's, they must be similar enough to permit the court to conclude that the claims of the absent members will be fully presented." Id., at 587.

"In brief, typicality is lacking when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class action lies." Id. at 465. See also, In Re: *The Gap Stores Securities Litigation*, CCH Fed.Sec.L.Rep. ¶ 96, 486 (N.D.Cal.1978); *West v. Capitol Fed. S. & L. Assn.*, C.A. No. T–5385 (D.Kan. Nov. 3, 1976) (modifying 13 August 1976 order) (unpublished). In its consideration of the adequacy of representation issue, however, the Court recognized that this rule would be inapplicable where the injuries result from a conspiracy or concerted practice. "Obviously [such a rule] does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury." Id. at 466.

In *West v. Capitol Fed. S. & L. Assn.*, supra, where the facts are similar to those in the present case, the court relied on *La Mar* in concluding that although plaintiffs asserted a conspiracy between the defendants the gist of the action was the damages sustained and not the conspiracy, and that plaintiffs' claims as to injuries and damages could not be typical of those defendants with whom they did not deal.

The defendants look to the ruling by the Fourth Circuit Court of Appeals in *Windham v. American Brands, Inc.*, supra, that the gravamen of an antitrust suit such as this is not the common issue of conspiracy but individual issues, pertaining to injury, and its applicability to the present suit as support for the conclusion of the *West* court. Defendants assert that the complaint here is for individual injury and not conspiracy and therefore, the *La Mar* exception is inapplicable and the typicality requirement is not met.

Generally, the sort of argument raised here by defendants is directed at the representative's standing or the adequacy of his representation of the class, rather than typicality.[6] However, to the extent that such an inquiry is appropriate under the issue of typicality, it would appear that the plaintiffs' representatives in this case satisfy the *La Mar* exception. As was stated in *Krehl v. Baskin-Robins Ice Cream Co.*, 78 F.R.D. 108, 115 (C.D.Cal.1978):

> [The defendant's position] is that a plaintiff who is a customer of defendant A cannot have typical claims against defendant B with whom he has no dealings, even though A and B have injured their customers by nearly identical conduct. This principal is enunciated in *La Mar v. H.B. Novelty & Loan Co.*, 489 F.2d 461, 465–66 (9th Cir. 1973)....

> The distinction between this case and the cases in La Mar is that the plaintiffs here allege a nationwide conspiracy to restrain trade. The La Mar decision specifically excepted the case of a conspiracy from its holding that a plaintiff who did not have actual dealings with a class defendant could not be an adequate representative. Ibid. at 466. While the conspiracy exception was discussed in the context of adequacy of representation, 23(a)(4), this Court believes that it is equally applicable to typicality of claims, 23(a)(3).

Moreover, the *La Mar* exception does not require the gravamen of a suit be conspiracy but merely that the injuries in the suit are the result of a conspiracy or concerted scheme between the defendants, at whose hands the class suffered injury. *La Mar v. H&B Novelty & Loan Co.*, supra, at 466. Accordingly, the reasoning in *West* appears to be incorrect and in any case there are other cases also similar to our facts which hold to the contrary. See e. g., *Sommers v. Abraham Lincoln Fed. S. & L. Assoc.*, supra; *Stavrides v. Mellon Nat'l Bank*, 69

---

**6.** In *La Mar*, the court confused the issues by assuming that the standing requirement had been satisfied and proceeding on to address the issue of class certification. Although courts will usually come to the same conclusion through a typicality or standing analysis where the representative is somehow deficient as to standing, it is generally considered to be improper to address what are in fact standing issues during a consideration of class certification. See generally 4 H. Newberg, supra, at §§ 7516, 7518.

F.R.D. 424 (W.D.Pa.1975) (Bank escrow cases).

██ In the present suit, the putative representatives assert that the entire class has suffered injury resulting from the alleged concerted practices. They will have to prove essentially the same facts as to the existence, implementation and consequences of the conspiracy for each member of the putative class. Such individual proofs as will be required to establish injury and damages are related to factual differences which may affect the predominance issue under 23(b). They do not relate to the typicality of the representatives' claims, however, as contemplated under Rule 23(a)(3). *State of Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 567 (D.Minn.1968).[7]

*4. Fair and Adequate Representation: Rule 23(a)(4):*

██ The two requirements of 23(a)(4) are the absence of potential conflicts between the representatives and other members of the class and assurances that the case will be prosecuted vigorously. See 4 H. Newberg, supra, at § 7518 et seq. In *Turner v. A.B. Carter, Inc.*, supra, this Court utilized a two-pronged test: (1) "[P]laintiff's attorney must be professionally competent to conduct the particular litigation"; and (2) "the interests of the representative must neither be in conflict with nor antagonistic to those of the class as a whole." The Court continued stating:

The antagonism between the representative party and the class which must be present before the certification will be

denied is that which goes to the "subject matter of the suit." 5 H. Newberg, supra, at § 8675D p. 548 (citations omitted). To ensure the absence of such conflict between the class and the representative, the "class representative must be part of the class and 'possess the same interest and suffer the same injury' as class members." Further, a representative party's claim should be co-extensive with those claims of the class he seeks to represent; this ensures the vigorous prosecution of the action by the representative which is implicit within the concept of Rule 23(a)(4) adequacy of representation. Id. at 364 (citations omitted). See generally, 4 H. Newberg, supra, at § 7578.[8]

The vigorous prosecution test is generally satisfied upon the court's determination that the plaintiff's attorney is professionally competent to conduct the particular litigation. Such is the standard in this Court As to the present case, this Court has previously recognized that plaintiffs' counsel have vigorously advocated the plaintiffs' case. *Brown v. Cameron-Brown Co.*, CA No. 78–0836–A–R at 17 (E.D.Va., 13 June 1980) (memorandum) and there is support from other courts that plaintiffs' counsel are competent. See e. g., *Sommers v. Abraham Lincoln Fed. S. & L. Assn.*, supra, at 589.

The second element of the test appears also to be satisfied. The issues which are similar to those raised by defendants under the issue of typicality can be resolved by the rationale as applied there.[9] Under the present facts all of the plaintiffs appear to

---

**7.** Defendants do not raise the issue that concerned the court in *Sommers v. Abraham Lincoln Fed. S. & L. Assoc.*, supra, where the court determined that the distinction between conventional mortgages and government financed mortgages were such that plaintiffs could not represent class as a whole but, that two subclasses would have to be created. Id. at 589.

**8.** Coextensiveness is an issue which may be more properly considered under the issues of typicality, standing or common questions than under 23(a)(4). 4 H. Newberg, supra, at § 7518b. To the extent that coextensiveness is considered under 23(a)(4) it should not be inter-

preted to mean that the claims be factually identical. See *Minnesota v. United States Steel Corp.*, supra; 4 H. Newberg, supra, at § 7518b.

**9.** Not every potential disagreement between members of the class will proscribe the use of a class suit; rather, the disagreement must be fundamental and go to the heart of the litigation. 4 H. Newberg, supra, at § 7518c. Standing, just as it is improper to consider under typicality, is also an improper consideration at this stage. To the extent that *La Mar* might apply, the present case comes within its exception.

be similarly situated.[10] Such inconsistencies as might arise subsequently through the factual developments with respect to possible differences between defendants' mortgage practices, might suggest the necessity for the creation of subclasses, a factor to be addressed under 23(b) rather than 23(a).

The defendants urge additionally, however, that plaintiff representatives are incapable of adequately representing the class as they not only fail to grasp the nuances of antitrust law but "have no notion of how they have allegedly been harmed or by whom." Def. Br. in Opp. to Cl. Cert., at 49. As such, defendants assert, they are but "strawmen" called in to support their lawyers' suit and, the class is left with blind reliance on counsel by uninterested and inexperienced representatives. See *Seidin v. Nicholson*, 69 F.R.D. 681, 688 (N.D.Ill.1976). See also *Levine v. Berg*, 77 Civ. 5467 (S.D. N.Y. June 9, 1978) (denying certification, in part, due to plaintiff's lack of personal knowledge of and unwillingness to learn about the facts upon which the case was based, and the undue emphasis she had placed on her attorney's ability to investigate and prosecute the suit, such that the only aid plaintiff rendered counsel was her willingness to act on behalf of her class and bear whatever costs such action might entail.)

Notwithstanding defendants' vigorous argument, and plaintiffs' limited involvement in the case, plaintiffs evidence a minimal knowledge and interest in the suit and they have acknowledged liability for costs, at least up to $5,000. The plaintiffs know their bank uses the escrowed funds without paying interest on it and they have severally cooperated in discovery. This Court has previously recognized in this case that a layperson can provide only minimal assistance to advise and guide his lawyer through the intricacies of a large anti-trust suit such as this. *Brown v. Cameron-Brown*, supra, at 17. Presumably, then, plaintiffs can be expected to rely heavily on their attorneys, and the award of attorneys' fees supports the important role that attorneys play in such cases. See e. g., *Dolgow v. Anderson*, supra. See also *Wolfson v. Artisans Savings Bank*, 83 F.R.D. 547, 550 (D.Del.1979) (bank escrow case wherein court rejected argument raised by defendants in this case). Moreover, the Supreme Court has evidenced particular leniency as to the amount of knowledge a plaintiff needs to have about the claim which is being brought. See *Surowitz v. Hilton*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1968).

In sum, plaintiffs satisfy each of the four prerequisites necessary to justify consideration of the class action device in the present case. Before the Court can certify the class, however, plaintiffs must additionally satisfy the Court that they come within the requirements set out in 23(b)(3).

### III.

Plaintiffs' burden under 23(b)(3) is to assure the Court that use of the class action device will achieve the economies of time, effort and expense contemplated by the Rule, without sacrificing procedural fairness or bringing about other undesirable results. Fed.R.Civ.P. 23 (Advisory Notes). Subdivision (b)(3) contemplates a dual test: First, questions of law or fact common to the members of the class must predominate over questions affecting individual members; and, second, the court must be satisfied that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The rule also suggests a non-exhaustive list of four factors that the court is to consider in making its determination.

### 1. Predominance of Common Questions

The issue of predominance is often treated by the courts in conjunction with their 23(a)(2) analysis. The focus of the 23(b)(3) requirement, however, is different. Whereas (a)(2) addresses the issue of whether Rule 23 has any applicability at all

---

**10.** But see *Sommers v. Abraham Lincoln Fed. S. & L.*, supra (finding that holders of conventionally financed mortgages versus government financed mortgages must be separated into two subclasses.

to the law suit, (b)(3) addresses the issue of whether Rule 23 certification will have practical utility in the suit, considering the facts, substantive law, procedural due process, and fundamental fairness. The Advisory Committee notes that only where questions common to the class predominate over questions affecting individual members will the court be able to achieve the economies of time contemplated by the Rule. Fed.R. Civ.P. 23 (Advisory Notes).

Professor Moore suggests that the predominance analysis involves two stages, not necessarily distinguished in practice. He states:

> ■ Once the threshold determination has been made that common questions predominate sufficiently to support overall class treatment, [2] the predominance criterion acts as a guide to the judge in molding and defining the action. At this juncture the standard assumes its more pragmatic aspect, as a test whether potential subclasses or other subdivisions can be useful. Here it is appropriate to consider simply the degree to which the common questions may be decisive of the issues to be dealt with in the separate phases of the action, in order to judge the efficiency of the arrangement. 3 B Moore's Federal Practice, supra ¶ 23.45[2] at 23–333.

This view comports with the fact that courts tend to approach the problem of predominance, in both the antitrust and the related securities frauds fields, from a perspective of "the severability of the issues of liability and damages—whether the asserted statutory violations can be effectively adjudicated in a class proceeding independent from the proceeding in which individual damages would be assessed." 3B Moore's Federal Practice ¶ 23.45[2] at 23–335.

Damages always require individual proofs and the crucial element in a court's analysis will be whether the "liability" issues (discussed below) are so closely linked to the "damage" issue that severability is not practicable.[11] See 3B Moore's Federal Practice, supra ¶ 23.45[2] at 23–336 n. 33.

Courts, in their consideration of this issue, have generally rejected quantitative tests comparing the amount of time and attention required to settle the common questions with that needed for the resolution of individual issues, *Sommers v. Abraham Lincoln Fed. S. & L. Assoc.*, supra, at 591; *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 569 (D.Minn.1968); 3B Moore's Federal Practice, supra, ¶ 23.45[2], although such considerations are relevant during the court's analysis of the superiority issue.[12] Similarly, an outcome determinative test has been rejected as well. Id. A valid concern at this stage is whether the class action will splinter into individual trials suggesting that common questions do not predominate over individual questions and that a class action would be inappropriate. Id.

■ Private antitrust actions, though usually brought under (b)(3), are accorded no presumption on the issue of predominance. See *Windham v. American Brands, Inc.*, supra, at 64 n. 6; 3B Moore's Federal Practice, supra, ¶ 23.45[2]; Fed.R.Civ.P. 23 (Advisory Notes). Courts are in agreement that a plaintiff in such an action must prove three elements to succeed: (1) violation of the antitrust laws; (2) direct injury to the plaintiff from each violation; and (3) damages sustained by the plaintiff. *Windham v. American Brands, Inc.*, supra, at 65; *Alabama v. Bluebird Body Co., Inc.*, 573 F.2d

---

**11.** See also *Windham v. American Brands, Inc.*, supra, at 71 (expressing trepidation about the use of bifurcated trials). As Windham indicates, certain types of class actions do not lend themselves to severability, and the court must decide when the issues of liability depend too strongly on the existence of damage, or where other issues are too intertwined to permit severability. See generally 3B Moore's Federal Practice, supra, ¶ 23.45[2].

**12.** Although for purposes of this memorandum the court has segregated the analysis of each element in Rule 23, courts regularly merge one or more of these elements in their consideration. This is particularly true with regard to the predominance and superiority issues which are often addressed commonly when discussing the managability of a particular suit. See e. g. *Windham v. American Brands, Inc.*, supra.

309, 317 (5th Cir. 1978). Moreover, in the Fourth Circuit, courts are to construe the gravamen of such an action to be the injury to the plaintiff as an individual, rather than issues relating to an overall conspiracy. *Windham v. American Brands, Inc.*, supra, at 66.

The several circuits have taken different approaches in addressing the class certification issue under 23(b) with the Fourth Circuit following a more restrictive approach. Compare *Windham v. American Brands, Inc.*, supra, with *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) cert. denied 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (criticized in Windham). The Fourth Circuit Court of Appeals focused considerable attention on the certification of class actions in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (en banc), cert. denied 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). *Windham* involved a suit by tobacco growers against several tobacco purchasing companies and others charging various antitrust violations as to the marketing and auction process for tobacco. The district court, after allowing full discovery on the class certification issue, denied certification primarily on the grounds that the action would become unmanageable, because of the complexity of proof of injury and damage. *Windham v. American Brands, Inc.*, 68 F.R.D. 641, 655–56 (D.S.C. 1975) rev'd 539 F.2d 1016 (4th Cir. 1976) (panel), rev'd 565 F.2d 59 (4th Cir. 1977) (en banc) cert. denied 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). The district court in *Windham*, however, was confronted by a morass of intertwined claims of conspiracy violations, individual claims of injury and damages which varied between plaintiffs as to nature and number of claims and their geographical and temporal involvement in several markets. The district court considered the possibility of severance and bifurcation but found such a procedure to be unhelpful under the particular facts. The court concluded that, upon consideration of the overwhelming nature of the individual claims and their complexity, individual issues relating to the fact of injury and damages predominated over the common issue of violation and, the class action would not be a superior remedy in such a case.

On appeal to the Fourth Circuit Court of Appeals, a panel of that court reversed the trial court's decision. *Windham v. American Brands, Inc.*, 539 F.2d 1016 (4th Cir. 1976), rev'd 565 F.2d 59 (4th Cir.) (en banc) cert. denied 438 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). The panel interpreted the underlying principles of antitrust actions as indicating a general policy to aid those who were injured by violations of the antitrust laws and evidencing congressional sympathy towards the usually small enterprise confronting the ordinarily large malefactor. The court stated there was almost a "rebuttable presumption" that a class action should be allowed where there is a plausible claim of violation of the Sherman Act. Id. at 1021.

The panel, addressing the facts, noted that an overly comprehensive use of the term "liability" had clouded the district court's ability to draw a sharp distinction between issues as to the alleged violations of antitrust laws and issues of causation. Id. at 1020. The panel suggested that notwithstanding the difficulty faced by plaintiffs in succeeding with their cause of action, the court should address initially the issues of antitrust violations which should not be rendered unmanageable because of the numerosity of the plaintiff class. The panel believed that if the district court bifurcated the trial, initially addressing the antitrust violation, it could limit the amount of evidence intertwined with other aspects of the case. If the plaintiffs failed at this stage the case would end whereas if successful the court could dispose of the injury and damage issues either in a mass trial with appropriate subclassifications or in individual trials.

The panel opinion, in turn, was reversed and the district court's decision affirmed by an en banc panel of the Fourth Circuit. *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) cert. denied 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). In sum, the court agreed with the district

court that the action would be unmanageable if brought as a class action.

As to the issue of common questions, the court stressed that the gravamen of a private antitrust suit for damages is the individual injury suffered by each plaintiff, and not the conspiracy itself. After setting out the three elements of an antitrust action the court stated:

> It follows, therefore, that a mere finding of violation does not result in liability. The statute gives a right of action only to the extent that one has been "injured in his business or property by reason of anything forbidden in the anti-trust laws." The gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury. While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized.

565 F.2d at 65–66 (footnotes omitted). Moreover, in their proofs, plaintiffs would be proscribed from presenting generalized or class-wide proof of damages.

### A. Violation

There is general agreement that a conspiracy allegation as to violation of the antitrust laws involves common questions as to the class and plaintiffs' proof in this action will generally be the same as to all defendants. See *Windham v. American Brands, Inc.*, supra; *Philadelphia v. American Oil Co.*, 53 F.R.D. 45, 67–68 (D.N.J. 1971). See generally, 4 H. Newberg, supra, § 7524.

### B. Fact of Injury or Impact

In numerous cases where certification has been questioned on the predominance issue, the court's resolution of the issue of liability usually has been the determining factor as to whether certification will be granted. Generally, where a court finds liability to be a question common to the class it holds 23(b)(3) satisfied. See 4 H. Newberg, supra § 7524(a) (and cases cited therein).

The confusion which often arises over the issue of liability results from a failure to distinguish between two of its elements; violation on the one hand and causation on the other. See *Windham v. American Brands, Inc.*, 539 F.2d 1016, 1021–22. The latter element is generally referred to as the issue of "fact of injury" or "impact." In cases of *per se* violations, such as price fixing, courts have readily held the causation issue to be common to the class, see 4 H. Newberg, supra § 7524(a) at 38 n.296, or where they have held causation to be an individualized issue, have resolved it together with the issue of damages; the (b)(3) predominance requirement is then met if other liability issues are common to the class. See e. g., *City of New York v. General Motors Corp.*, 60 F.R.D. 393 (S.D.N.Y. 1973), appeal dismissed as to class cert. 501 F.2d 639 (2d Cir. 1974) (monopolization). See generally 4 H. Newberg, supra, § 7524(a). Other courts, however, in holding that the impact issue is an individualized issue have relied in part on that determination to deny certification. See *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) cert. denied 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Shumate & Co., Inc. v. National Assoc. of Securities Dealers, Inc.*, 17 F.R.Serv.2d 300 (N.D. Tex. 1973), aff'd 509 F.2d 147 (5th Cir. 1975); *Gneiting v. Tagarrer* 17 F.R.Serv.2d 311 (D. Idaho 1973).

As a practical matter, where plaintiffs have been affected by a concerted practice effecting a common course of conduct, the proofs necessary to establish "the fact of injury" or "impact" will be essentially the same for each member of the class notwithstanding the rule that such an issue is individual to each plaintiff. As to the present case, proof as to the existence, implementation and effect of the alleged conspiracy appear to be the same for each class member. Accordingly, the evidence necessary to prove liability of the defendants, i. e., violation and impact, would appear to be sufficiently similar as to all members of the class to permit resolution within the class action process.

### C. Damages

In *Windham*, the court ruled that damages are strictly an individual question and

not susceptible to generalized or classwide proofs. 565 F.2d at 65–66. However, courts have recognized that individual damage questions will not be held to predominate to the preclusion of a class action where liability has been found to be common to the class, 4 H. Newberg, supra § 7524, where the issues of liability and individual damages can be treated separately, see *Sommers v. Abraham Lincoln Fed. S. & L. Assoc.*, 66 F.R.D. 581, 591 (E.D. Pa. 1975) (bank escrow case); 3B Moore's Federal Practice, supra ¶ 23.45[2] at 23–334, or where damages are susceptible to mathematical or formula calculation. See *Windham v. American Brands, Inc.*, supra, at 68.

### D. Defendants' Arguments

Defendants challenge plaintiffs' assertion as to predominance of their claims on several grounds. First, defendants stress the *Windham* court's rule, that the "gravamen" of antitrust suits is the individual issue of the "fact of injury" or "impact," not the common issue of conspiracy and, that such authority as plaintiffs cite to the contrary is not controlling in the Fourth Circuit. Moreover, defendants assert that, as to each element plaintiffs must satisfy, individual questions will predominate.

As to the conspiracy, defendants assert that plaintiffs will have to establish more than mere parallel conduct and that each of the defendants will have a defense, raising individual issues of law and fact. Notwithstanding the possibility that each defendant might have some defense as to itself, each member of the class will have to submit proof essentially the same as that submitted by other class members as to the existence, implementation, and effect of the conspiracy. Such proof should be common to the entire class in this case and would predominate over any of the individual questions of law or fact which defendants might raise.

Defendants assert that "the fact of injury" is an individual question in all cases and alone may serve as the basis for rejecting class action treatment. See *Yanai v. Frito Lay, Inc.*, 61 F.R.D. 349, 351–52 (N.D. Ohio 1973); *Hettinger v. Glass Specialty Co., Inc.*, 59 F.R.D. 286, 294 (N.D. Ill. 1973). Defendants distinguish the present case from price fixing cases by suggesting that establishing the fact of injury for each class member will involve a complex examination of evidence probative of at least five divergent issues:

(i) Whether the particular loan has an escrow and whether the escrow resulted from the mandate of a federal or state law (e. g. FHA and VA Loans), a private mortgage insurer or a private mortgage purchaser;

(ii) Whether a particular borrower expressly requested an escrow account for any of a variety of possible reasons;

(iii) Whether the particular borrower's escrow account has, at any time, been deficient and been supplemented by funds of his or her lender advanced interest free and permitted to be repaid over a period of succeeding months in order that taxes, insurance, premiums or assessments could be timely paid;

(iv) Whether the particular borrower would have defaulted in the payment of taxes or insurance premiums but for the escrow service of his or her lender;

(v) Whether the administrative service of accumulating funds for the payment of taxes and insurance premiums provided by the particular borrower's lender is not, in fact, worth more to him than the value of interest, if any, that he might otherwise have earned on his escrow funds.

Of the five factors, the first raises the most significant questions. To the extent that this factor raises issues affecting less than the class as a whole, it may require the court to create two or more subclasses, as has been done in other similar circumstances. See Fed.R.Civ.P. 23(c); *Sommers v. Abraham Lincoln Fed. S. & L.*, supra. This factor like the second factor may also raise a possible issue as to standing to assert a claim but that is an issue beyond the pale of class certification consideration. The third factor may raise a right of set-off against the plaintiffs but does not raise questions as to liability. The fourth factor is irrelevant

as to whether plaintiffs were injured by the conspiracy. Finally, the fifth factor, though also raising a possible right of set-off against the plaintiffs, has little to do with the issue of liability or impact in this case.

*Windham* proscribes plaintiffs from relying on the several cases holding impact to be a common question. However, *Windham* only proscribes the use of generalized or common class proofs as to the issue of damages, 565 F.2d at 66, and the *Windham* court did not deny that the fact of injury or impact might be the same for each individual plaintiff. Moreover, the court did not state that injury, though it is the "gravamen" of the case, will in all instances predominate over common questions.

Defendants also highlight the possible complexity of plaintiffs' proof on the issue of damages, including the possibility of counterclaims. In *Windham* the *en banc* court discussed the problem of injury and damages at length. The plaintiffs in *Windham* had challenged the district court's denial of certification as being plainly wrong, emphasizing that the court's decision was based on difficulties inherent in establishing injury and damages, and stating that such grounds did not justify the denial of class certification. The appeals court noted the considerable support for such an argument but also recognized support existed for the district court's decision as well. The court summarized that the differences in the cases rested on a factual divergence rather than a legal divergence.

> Thus in cases where the fact of injury and damage breaks down in what may be characterized as "virtually a mechanical task," "capable of mathematical or formula calculation," the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate "mini-trial,[s]" of an overwhelming large number of individual claims, courts have found that the "staggering problems of logistics" thus created "make the damage aspect of [the] case predominate," and render the class unmanageable as a class action.

565 F.2d at 68. Such a view, stated the court, would accord with the purpose of Rule 23. Id. Defendants assert that plaintiffs' claims are such that no mathematical or formula solution is possible, thus raising the specter of the need for numerous mini-trials.

In response to defendants' assertions, plaintiffs correctly point out that to establish their right to class certification, they need not prove that the common questions are dispositive of the entire litigation as it pertains to each individual. Rather, Rule 23(b)(3) requires only a demonstration by plaintiffs of the predominance of common questions. See *Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100 (E.D.Va.1980); *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685 (E.D.Pa. 1977); *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34 (S.D.N.Y.1977) appeal dismissed 574 F.2d 656 (2d Cir. 1978). See also *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 335 (E.D.Pa.1976); *Dolgow v. Anderson*, supra.

## E. *Subclasses and Bifurcation*

If the Court were to determine that individual issues predominated as to the class as a whole, the court should then consider possible alternatives under Rule 23(c), to determine whether the creation of subclasses would present common questions as to various subclasses. *Pruitt v. Allied Chemical Corp.*, supra at 111; 3B Moore's Federal Practice, supra ¶ 23.45 at 23–329.[13] Other courts facing suits similar to ours have found the subclassification device useful in separating divergent types of mortgages.

---

**13.** That some plaintiffs would find themselves possibly in more than one subclass, unlikely in this case, would not preclude class certification as each plaintiff could be represented in each class or elect to be excluded from any given class. See *Pruitt v. Allied Chemical Corp.*, supra, at 113; *Schmidt v. Interstate Federal Savings and Loan Assoc.*, 74 F.R.D. 423 (D.D.C. 1977).

See e. g., *Sommers v. Abraham Lincoln Fed. S. & L. Assoc.*, supra (creating subclasses for conventional and government insured mortgages).

Alternatively, the court should consider whether the severance of one or more issues would prove advantageous. Thus, the presence of issues particular to individual plaintiffs may necessitate the court's employing the second element of Rule 23(c)(4), bifurcating the class action between issues. See *Pruitt v. Allied*, supra, at 113. When combined with subclassification, the severance device "will allow each class to establish, if they can, [the defendants'] liability to the class, while reserving the proof and computation of individual plaintiff's damages, as well as any defendant's . . . for a later proceeding." Id. Such a procedure is recognized in the Advisory Committee notes and has been utilized by a number of federal courts where the advantages and economies to be achieved by a single adjudication of common issues recommends class action treatment of those issues. Id. (and cases cited therein).

The Court in *Windham* does not proscribe the use of such a procedure in appropriate circumstances, though it would approach the severance issue with "trepidation." 565 F.2d 59, 71. The panel of that court suggested that the issue of liability should be refined into issues of violation and impact, and that the district court should try the issue of violation separately. 539 F.2d 1016, 1023.[14] In reversing the panel, the court did not say that such procedures would never be appropriate, rather, it emphasized its doubt about such devices stressing caution. The reason for the court's trepidation was tied in part to the inability in most antitrust cases to find a "neat dividing line between the issues of liability and damages." 565 F.2d at 71. As previously discussed, the issue of liability in this case can be broken down into the subissues of violation and causation, at which point the ability to draw a "dividing line" is

greatly facilitated. Violation of the antitrust laws will usually be a common issue. The issue of impact will also reflect a common thread. Both issues, at least as to the present case, can be determined without detailed examination of individual damages.

In *Windham*, the court recognized that the issues of that particular case were tightly intertwined and that no severance would remove or aid the "overwhelming burden of damage mini-trials that class certification would impose on the judicial resources." 565 F.2d at 71–72. As to the severance issue, the court was concerned that the panel had given undue predominance to the issue of antitrust violations over the issues of injury and damage which it believed was against the rule that the violation was not to be considered the crux of such actions. If such a rule were applied, it would lead to an almost automatic severance and certification of classes in private antitrust actions. Id. at 71 n. 38. The court also expressed concern that the panel's suggestion would raise an issue as to the standing of certain members of the class. However, recognizing that an overly strict application of standing rules would conversely result in a uniform denial of class certification, the court concluded that neither rule should be regarded as absolute, but the district court should decide the matter "considering all aspects of the case, including the issues of injury and damage as well as of violation." Id. at 71 n. 38.

The court concluded that it was within the trial court's "wide range of discretion" to find that bifurcation would not make the case manageable or warrant class certification considering the intertwined nature of liability and damages and, that "no severance of issues could remove or even alleviate the overwhelming burden of damage mini-trials that class certification would impose on the judicial resources." Id. at 71–72. Finally, the court approved the district court's finding that damage proof would be

---

14. Although this procedure was specifically approved by the Third Circuit in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) cert. denied 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d

791 (1978), the Fourth Circuit rejected that court's approval of the Fourth Circuit's panel opinion. 565 F.2d 59, 71.

unmanageable in such a class action as there was no formula by which individual proof of damages might be determined and it would be undesirable and impractical for a jury to consider the issue of damages in a separate proceeding independent from the proceedings on liability.

This court is, of course, bound by the decision in *Windham*, to the extent that it is applicable to the present case. That decision, however, has been distinguished on several occasions as presenting a set of uniquely intertwined facts. See *Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246, 264 (N.D.Cal.1978); *National Super Spuds v. N.Y. Mercantile Exchange*, 77 F.R.D. 361, 363 (S.D.N.Y.1977); *Shelter Realty Corp. v. Allied Maintenance, Inc.*, 442 F.Supp. 1087 (S.D.N.Y.1977). See also, *Pruitt v. Allied Chemical Corp.*, supra (allowing both bifurcation and subclassification). Without accepting these latter cases as authority, they do help in appreciating the impact of *Windham* on the instant case.

As to the present case, the proof plaintiffs' representatives would have to present to establish the existence, implementation, and effect of a conspiracy would be essentially common to the entire class constituting a "common thread of evidence which would correspond to evidence which would otherwise be introduced by absent class members." *In re Sugar Antitrust Litigation, supra*, at 73 F.R.D. at 345. Such individual defenses as may exist would not appear sufficient to predominate over the common questions affecting the class as a whole. Establishing a conspiracy in this case, though not the gravamen of the case, will be a crucial and most difficult aspect of the case to prove. The present case may present facts which are particularly suited to severance of the violation issue as failure on that point would be entirely dispositive of the rest of the case.

To satisfy the issue of the fact of injury, plaintiffs would need to prove a causal tie between the violation and some loss resulting from that violation. If defendants did conspire to eliminate the capitalization method of accounting and to offer only the escrow method, without interest being paid to the plaintiff class, the fact of injury, if any, would be essentially identical as to each class member. See *Sommers v. Abraham Lincoln Fed.S. & L.*, 66 F.R.D. 581, 591 (E.D.Pa.1975). Cf., *Wolfson v. Artisans Savings Bank*, 83 F.R.D. 547 (D.Del.1979) (allowing such proof to proceed on a class-wide basis). *Windham*, although treating impact as an individual issue, does not rule out the possibility that proof of impact may in fact be the same for the entire class, 565 F.2d at 66, though it does indicate, in dicta, that perhaps the standard of proof as to impact may be higher than that required for damages. 565 F.2d at 66 n. 14.

As to damages, the plaintiffs appear to be correct in their assertion that damages could be determined mathematically or through a formula in a relatively simple procedure, which they themselves have suggested.[15] The concern expressed in *Windham* as to the complexity of resolving the damage issue appears to be obviated in this case. The litany of horrors suggested by the defendants in this case which were a legitimate factor in *Windham* simply do not present themselves here. Accordingly, the court should rule that the issues common to the plaintiff class predominate over questions affecting individual members of the class, namely, that questions of conspiracy are common questions, the issue of impact, though individualized will in fact involve proof common to the entire class and that such individual questions as are involved in the determination of damages will be subject to mathematical or formula proofs.

---

**15.** Plaintiffs suggest that an interest factor might be applied to the amount that they deposited in the escrow accounts. The proper interest level might be determined either by an analysis of the bank's returns on its investment or by simply paying a savings account or other rate of interest on the escrow accounts. Furthermore, in developing the formula, a procedure could be added to include any setoffs and counterclaims that a defendant might have against a particular plaintiff. Presumably, all this information is within or could be determined through the bank's computer.

### 2. Superiority of the Class Action Device

▮ The final factor that the court must consider in the certification process under Rule 23(b)(3), is whether the class action device is superior to other available methods for the fair and efficient adjudication of the controversy. The Rule lists four non-exclusive factors to consider in addressing this issue. These matters include:

(A) The interest of members of the class individually controlling the prosecution or defense of separate actions;

(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) The difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Often, as was the case in *Windham*, the court will combine its consideration of the superiority issue with that of the predominance of common questions over individual questions. This is particularly true when the court focuses on the manageability of the class action. See Fed. R.Civ.P. 23(b)(3)(D).

▮ The superiority issue in Rule 23 involves considerations distinct from those of the predominance issue and involves a determination of whether the class action device is superior to *other* methods available to the court for a fair and efficient adjudication of the controversy. 4 H. Newberg, supra, § 7526; 3B Moore's Federal Practice, supra, ¶ 23.45[3]. The consideration involves comparative analysis between judicial remedies and does not contemplate the possibility that no action at all might be superior to a class action in a given case.[16] Id. supra.

Of the four factors under (b)(3), "manageability is often raised to the level of preeminent importance," see 4 H. Newberg, supra, § 7526(e); *Windham v. American Brands, Inc.*, supra at 65, often to the exclusion of other factors in the case. See 4 H. Newberg, supra, § 7526(e).[17] Manageability, however, should be considered only in relation to alternative means of adjudication and thus should not be used to deny certification in the face of novel challenges, but "only where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class, can difficulties in management support denial of class certification under 23(b)(3)." 3B Moore's Federal Practice, supra ¶ 23.45[4.–4].[18]

Generally, there appears to be an acceptance that where doubts exist as to the advisability of proceeding with a class action they should be resolved in favor of class certification. See e. g., *Esplin v. Hirsch*, 402 F.2d 94 (10th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1968) (securities frauds cases); 4 H. Newberg, supra, § 7540(h). *Windham* is not inconsistent with this concept, at least as it pertains to potential problems which might arise during the course of litigation. See 565 F.2d 59, 70.

The advantage of the class action device has frequently been recognized in situations where it enables persons with claims of small individual injuries to pool their resources to wage a fight to vindicate their

---

**16.** Indeed, it is the view of the Court, at least at this stage, that the issues presented, if they are subject to governmental interference at all, are more properly subject to legislative rather than judicial oversight.

**17.** Factors (B) and (C) have little bearing on the present action. Factor (A) supports the use of the class action device in this case as not one of the plaintiffs has come forward to express an interest or willingness to pursue the suit individually.

**18.** Such an analysis comports with the idea that none of the four suggested factors should be determinative of the grant or denial of class status as they are simply pertinent details to be checked; their presence or absence reflecting on the advisability of allowing a class suit to go forward. 3B Moore's Federal Practice, supra ¶ 23.45[4.–1].

rights, see 3B Moore's Federal Practice, supra, ¶ 23.45[3] at 23–347, or where a suit is brought on behalf of a large group claiming to have been injured by defendant's activities in restraint of trade, where liability depends on issues uniformly relevant to all those allegedly harmed. 3B Moore's Federal Practice, supra, ¶ 23.46 at 23–397. This has been held to be particularly true where statutory rights are the basis for the suit. 3B Moore's Federal Practice, supra, ¶ 23.-45[3].

Alternatives to the class action device include: the test case, joinder, intervention, consolidation, and individual actions. 4 H. Newberg, supra, § 7526; 3B Moore's Federal Practice, supra, ¶ 23.45[3]. None of these alternatives appears to offer a superior solution to the fair and efficient adjudication of the case than a class action.

A class action in this suit would adjudicate the issues as to the entire class. A "test case," which was favored by the court in *Windham*, would pose many of the evidentiary problems that would exist for the class action and would subject the court to a possible multiplicity of suits, from parties who are so situated as not to be squarely addressed by the issues before the court. Moreover, as each defendant alleges to have its own individual defenses, it would seem unlikely that the court could achieve agreement among the defendants to accept the results of a test case. Joinder, intervention, consolidation and individual actions all appear to be inappropriate alternatives to the present action considering the potential size of the class. In contrast to *Windham*, no plaintiff has come forward to indicate that he or she would proceed with an action alone and out of his or her own resources.

## CONCLUSION

Before the Court may certify a suit as a class action, it must be satisfied that the suit is amenable to class action treatment and that a class action would be superior to other methods for the efficient resolution of the dispute. Rule 23(a) and (b) set out the conditions the moving party must satisfy. 23(a) establishes standards that are prerequisite to class action consideration including factors pertaining to: Numerosity, whether there are common questions of law or fact, whether the claims of the representatives are typical of those of the putative class and, whether the representatives will adequately and fairly represent the class. Plaintiffs satisfy each of these elements.

23(b) establishes factors to determine whether a class action would be the most efficient method to dispose of the matter. Subject to a nonexhaustive list of factors, the court must determine both whether common questions of law or fact predominate over individual questions and whether a class action is superior to other judicial methods in resolving the case. The predominant concern in most cases is whether the class action will be manageable. Antitrust plaintiffs must satisfy three elements to succeed under their cause of action. They must prove: (1) Violation of the antitrust laws; (2) direct injury to the plaintiff from each violation; and, (3) damages sustained by the plaintiff. The Fourth Circuit Court of Appeals has ruled that the "gravamen" of such an action is the issue of injury, an issue which that court views as being individual to each plaintiff though not necessarily predominate.

■ In the present case, the critical importance of the common issue of conspiracy, the substantially similar proofs required to establish injury in fact to each plaintiff, and the ability to determine damages by mathematical or formula process suggest that common questions predominate over individual questions in this case. Moreover, as the case appears manageable and as no alternative remedy appears to afford a more efficient method of resolving the present suit, the court should proceed to certify the class.[19]

**19.** The Court has considered defendants' motion of 8 October 1981, to delay certification of the class pending a ruling on defendants' motion for summary judgment, but sees no benefit either to defendants or plaintiffs in further delaying its ruling.

Defendants argue that delaying class certification might avoid the expense and burden of

The parties shall, within 20 days, submit a certification consistent herewith agreed to as to form.

And it is so ORDERED.

notice. The fact is that the expenses defendants foresee would probably be incurred eventually whether or not the present putative class is certified. See *Shelton v. Pargo, Inc.*, 582 F.2d 1298 (4th Cir. 1978). The Court is mindful of the potential negative ramifications that notice might have on the good will and reputation of the various defendants, regardless of the outcome of the case. The Court will endeavor to minimize this effect through the notice process.

The Court does not believe, however, that a delay or denial of class certification would lead to the conservation of judicial time and resources contemplated by defendants; for the reasons previously stated. While the Court does not act as a robot in the application of Rule 23(c), when the Court determines that substantial reasons to delay further are lacking, it must comply with the dictates of the Rule.